(55 Misc. Rep. 516)

ROBINSON v. NEW YORK, W. & B. RY. CO. et al.

(Supreme Court, Special Term, New York County.    August 17, 1907.)

**1. INJUNCTION—TEMPORARY INJUNCTION—HEARING—SCOPE OF INQUIRY.**

November, 1906, P. and T., directors of the W. Railway Company, obtained absolute control thereof and of its rival, the P. Railroad Company, the C. Company, which was organized to build the W. Road, and a holding company to which the securities of the other companies were transferred. Annual payments to New York City under the W. franchise had been paid and $3,427,000 invested in the W. project, when work was stopped by P. and T., who held W. stock originally deposited with underwriters as security for the completion of the W. Road and obtained by P. & T. upon condition they would replace unsatisfactory underwriting with good underwriting to enable the C. Company to complete the W. Road. They had not met an obligation to pay the balance due on the underwriting, and it does not appear any call has been made upon the subscribers for any part of that unpaid underwriting. November, 1906, the investment in the P. Company did not exceed $211,500, and the prospective value of its franchise depended upon driving the W. Company from the field. P. and T. state the P. Company was bought to dissipate serious opposition. Though no reason appears for hesitation in completing the W. Road, P. & T. attempt to turn it over to the P. Company, asserting grave doubts as to the validity of the W. charter, though on eminent legal opinion they had, as presidents of trust companies invested trust funds in W. securities. A minority stockholder sues to restrain the granting of an application of the P. Road to change its route to coincide with the W.'s as fixed in the W. franchise, and to restrain the W. directors from consenting to such change or the use of the W. property. *Held*, on motion to restrain the surrender of the W. company's rights, that, if the court could adjudicate the company's corporate existence, the power should not be assumed, since the P. Company and P. and T. take conflicting positions, the company asserting the nonexistence of the W. Company and P. and T. asking that the W. Company be permitted to execute the proposed contract.

**2. SAME—TEMPORARY INJUNCTION—GROUNDS.**

It appearing plaintiff has good ground to fear the value of his stock will be greatly depreciated or rendered valueless if the application for a change in the P. Company's route is granted, and the proposed contract executed, a temporary injunction will be continued pendente lite restraining such acts.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 27, Injunction, § 305.]

Suit by one Robinson against the New York, Westchester & Boston Railway Company and others. Motion by plaintiff to continue pendente lite a temporary injunction. Motion granted.

James H. Caldwell, for plaintiff.

William C. Trull, for defendant New York, W. & B. Ry. Co.

Stetson, Jennings & Russell, for defendants Thorne, Perry, and others.

Graham & L'Amoreau, for City & County Contract Company and others.

DAYTON, J. The plaintiff, a minority stockholder of the New York, Westchester & Boston Railway Company, moves to continue pendente lite a temporary injunction restraining the board of estimate from granting an application of the New York & Portchester Railroad Company to so alter its route, or any part thereof, in the city of New

York as to coincide with the route of the New York, Westchester & Boston Railway Company, as prescribed in the franchise granted to said company by the board of aldermen, approved August 2, 1904; and also restraining the New York, Westchester & Boston Railway Company (hereinafter referred to as Westchester Company), its officers, directors, and agents, until the hearing and determination of this motion, from consenting or contracting or agreeing in any manner to consent to said change of route, and from assigning or conveying or contracting to assign or convey unto said New York & Portchester Railroad Company (hereinafter described as Portchester Company) the right to use the road of said Westchester Company or any of its property, real or personal, contracts or choses in action.

Plaintiff is a bona fide holder of $330,000 par value of the capital stock of the Westchester Company, as is evidenced by voting trust certificates under a voting trust agreement dated about December 8, 1904, the stock standing on the books of the railway company in the names of voting trustees; the entire equitable interest being in the holders of the voting trust certificates, except the right to vote such stock, which is lodged in the voting trustees for a period not to exceed five years from the date of the voting trust agreement. Plaintiff brings this action on behalf of himself and other stockholders similarly situated, and the relief demanded in the complaint is a perpetual injunction restraining the commission of the above described acts on the ground that the board of estimate has no power to give to the Portchester Company the franchise previously given to the Westchester Company by the board of aldermen, which is still in full force and effect; and on the further ground that the proposed assent to this action of the board of estimate on behalf of the Westchester Company and the proposed transfer by the Westchester Company to the Portchester Company of its construction work, real estate, and rights of way is without consideration, and is fraudulent and inequitable and in disregard of the rights of the minority stockholders.

The substantially incontrovertible facts considered upon this motion seem to me to be as follows: The Westchester Company was organized in 1872 under the general railroad law of 1850 to build a railroad from Port Morris, on the Harlem river, to Portchester, in Westchester county (with certain branches not necessary to be herein referred to). The Portchester Company was organized in or about the year 1901 under the general railroad law of 1900 to build a railroad from a point on the Harlem river, in the city of New York, to Portchester. The route of each company was substantially parallel in the city of New York. The Westchester Company filed in the office of the county clerk its maps and profiles showing its route in the city of New York. The board of aldermen on July 26, 1904, adopted an ordinance, which was approved by the mayor August 2, 1904, granting to the Westchester Company, its successors and assigns, a franchise to construct and operate a four-track railroad within the city of New York over the route as defined in said maps. By the terms of this ordinance the Westchester Company was required to pay to the city $8,000 per year for the first 10 years, and $16,000 per year during the

next 15 years, and also to expend at least $1,000,000 for construction within the city of New York, exclusive of moneys expended for rights of way, within two years from the date of the signing of the ordinance. These terms have been complied with. The Westchester Company up to August 2, 1906, had expended upwards of $1,077,000 for construction, consisting of grading, embankments, bridges, abutments, culverts, ducts, cutting, and filling, etc. Of the total line within the city about 13,000 out of about 23,000 feet are completed. Nearly all the bridges have been erected and requisite material to complete the construction of the road within the city of New York has been bought, paid for, and delivered ready to be put in place. In addition to this the Westchester Company has expended about $700,000 for the purchase of real estate and rights of way within the city boundaries, and about $1,650,000 for construction work and purchase of real estate in Westchester County. The Portchester Company obtained a franchise from the board of estimate and apportionment May 31, 1906, upon a route substantially parallel with that of the Westchester Company; but has done no construction work in the city of New York. Permission was secured in 1904 by the Westchester Company to increase its capital stock from $1,000,000 to $20,000,000, and an issue of $20,000,000 first mortgage bonds was authorized. Thereupon a contract was entered into with Charles H. Smith for the building of the main line, which contract was subsequently assigned to the County Contract Company, a corporation organized for the purpose of building and equipping the road. Shortly thereafter, by an agreement between the firm of Dick & Robinson, bankers, of which plaintiff was a member, and the contract company, said firm organized a syndicate for the purchase of $15,000,000 of the bonds and $4,500,000 of the stock of the Westchester Company in order to provide funds to build the road. Subsequently the syndicate managers (Dick & Robinson) having procured an underwriting satisfactory to the Westchester Company to an amount sufficient to secure at least $6,000,000 in cash, bonds to the amount of $14,400,000 par value, and voting trust certificates to the amount of $6,000,000 were deposited, together with a copy of the contract between the contract company and the syndicate and a copy of the agreement of underwriting with the Knickerbocker Trust Company. There was actually paid in on this underwriting about $4,500,000 upon the understanding that for each subscription of $900 the subscriber should receive a first mortgage bond of $1,000 par value and $300 par value of the stock of the Westchester Company.

In October, 1906, the contract company became indebted to the trust company of America (of which the defendant Thorne was president) in the sum of $200,000, and also to the Union Trust Company of Providence, R. I. (of which the defendant Perry was president), in the sum of $100,000. These two defendants were then and were at the commencement of this action directors in the Westchester Company, and Mr. Perry was and had been since June, 1905, chairman of its executive committee. Messrs. Perry and Thorne, on behalf of their respective trust companies, demanded payment of these loans, but on October 10, 1906, offered the contract company that they would re-

place unsatisfactory underwriting to an amount between $9,000,000 and $10,000,000 to furnish funds "in order to complete your company's contract of construction," for which they were to have voting trust certificates for all the stock of the Westchester Company in which the contract company was interested, amounting to not less than $11,396,000, such delivery to be subject only to the voting trust agreement and otherwise to be free and clear of any lien or claim. On October 26, 1906, the contract company entered into an agreement with Perry and Thorne whereby the latter were to supply the place of all unsatisfactory underwriters with good and satisfactory underwriting, so that said subscriptions should aggregate the total of $15,-000,000 at par, whereby funds would be provided to complete the road. Messrs. Perry and Thorne also agreed to purchase the stock of the stockholders of the contract company evidenced under a certain voting trust agreement between the trustees and the stockholders of the contract company and the contract company assigned therefor to Perry and Thorne all their interest in the stock of the Westchester Company, amounting at par to $11,396,000 ($10,325,000 of which was stock deposited with the original underwriting syndicate as security for the completion of the railway). These gentlemen also subscribed to the syndicate agreement the amount of $9,158,700, and in this manner obligated themselves to pay that amount for the account of the contract company to be used for the construction of the Westchester Company's road.

They next, on October 29, 1906, caused to be adopted by the board of directors of the Westchester Company a resolution releasing $10,-325,000 par value of the stock of that company held by the syndicate managers as security for the completion of the road and authorizing the delivery of the voting trust certificates representing such stock to the contract company free from said pledge. The balance of $1,071,-000 of the total of $11,396,000, which was all the stock of the Westchester Company in which the contract company was interested, was not subject to this pledge. This stock was subsequently delivered to Perry and Thorne, and they became owners of a majority of the stock of the Westchester Company; said $11,396,000 being 55 per cent. of the $19,000,000 originally issued to the contractor. The voting trustees were on November 16, 1906, replaced by trustees who were with one exception represented by Messrs. Perry and Thorne, and the same persons were appointed voting trustees under the agreement of the stockholders of the contract company. Having obtained full and absolute control of the contract company and the Westchester Company, Perry and Thorne then purchased the control of the Portchester Company, which at that time had a total stock issue of $250,000, with $211,500 outstanding, and this was done, according to Mr. Perry's affidavit, "to overcome the most serious obstacle in the way of the construction of the Westchester road." These gentlemen next organized in November, 1906, the holding company, known as Millbrook Company, and transferred to that company all their interests in the securities of these two railway companies and the contract company. Subsequently they acquired by assignment from various persons and corporations who had subscribed to the syndicate agreement all their interest in the bonds

and stock of the Westchester Company, and obligated themselves to pay the balance due on such subscriptions, so that as the situation now stands they are liable for the balance due on the total underwriting of $15,000,000 obtained to build the Westchester Company's road, although it is admitted that they have made no payments on these underwritings since they obtained the control of both of said railroad corporations and the contract company. It is a circumstance that work on the construction of the Westchester Company's road was stopped at about that period.

On April 4, 1907, an application was made by the Portchester Company to the board of estimate and apportionment for the right to change its line in New York City to a route which coincides almost exactly with that of the Westchester Company, for which the latter company was awarded a franchise in August, 1904. The report of the engineer of the franchise department on this application mentions this fact, and states that, if the application should be granted, the city, so long as the franchise heretofore given to the Westchester Company remains valid, would be in the position of having granted two franchises for railroads of the same construction over the same route, but to meet this objection the report mentions a form of proposed contract offered by counsel for the Millbrook Company between the Portchester Company and the Westchester Company by which the Portchester Company is to construct its railroad upon so much of its route as is common to both companies, and that both companies shall have a common right to operate trains over such line upon a schedule to be mutually agreed upon, etc. The proposed contract further assigns to the Portchester Company all the rights acquired by the contract company for construction of the Westchester Company's road, and also assigns and transfers to the Portchester Company all the construction work, materials, bridges, tunnels, and other property now owned or hereafter to be acquired by the Westchester Company from the southeasterly corner of Bronx Park to the city line. The granting of this application by the board of estimate is now sought to be permanently enjoined, and the plaintiff also seeks to permanently restrain the execution of the proposed contract or any similar contract which shall in effect turn over the entire property of the Westchester Company in the city of New York to the Portchester Company or the holding corporation known as Millbrook Company.

To recapitulate: In or about November, 1906, the defendants Perry and Thorne were directors of the Westchester Company (defendant Perry being then and having since June, 1905, been chairman of its executive committee), and found themselves, by virtue of the various proceedings heretofore recited, in absolute control of the Westchester Company, its rival, the Portchester Company, the contract company, and the holding Millbrook Company, to which latter corporation the securities of all of the three other corporations had been transferred. The annual payments to the city under the Westchester franchise had been kept up by that company. One million seventy-seven thousand had been expended in New York City on the Westchester road; $700,000 had been expended for real estate and rights of way within the city boundaries; about $1,650,000 had been

expended for construction work and purchase of real estate in West-chester County. A total of about $3,427,000 had been actually in-vested in the Westchester Railroad project. Of the line within the city 13,000 out of 23,000 feet were about completed. Nearly all the bridges had been erected. The material to complete the construction of the road within the city had been bought, paid for, delivered, and ready to put in place. Nevertheless at this juncture all construction work was stopped by direction of Messrs. Perry and Thorne, who were in absolute possession of the contract company and of $11,396,000 of the Westchester Company's stock, which had been orignally de-posited with the underwriting syndicate as security for the completion of the Westchester road. This stock they had secured upon condition that they would replace unsatisfactory underwriting with good and sufficient underwriting to an amount between nine and ten million dollars in order to enable the contract company to complete the West-chester road. They were obligated to pay the balance due on the underwriting, to wit, the difference between $4,500,000 and $15,000,000. This obligation they have not met, nor does it appear that any call has been made on the subscribers for any part of that unpaid under-writing.

About November, 1906, the entire amount which had been invested in the Portchester Company did not exceed $211,500, and the pros-pective value of its franchise depended wholly upon driving the West-chester Company from the field. No construction work had been done, no underwriting was prepared. The Millbrook Company was a corporation with a nominal capital, organized solely for the purpose of holding the securities of the other three corporations which had been transferred to it. It would seem that the Westchester Company was in a position with regard to the Portchester Company of having its entire construction and equipment financially assured, and, in ad-dition to this, it had a franchise for a better route than the Portchester Company, which the latter company demonstrates by now seeking to secure that route in preference to its own. It is not explained why there should have been any hesitation in proceeding to finish the construction and equipment of the Westchester road. Everything was apparently ripe for progress. The Portchester Company had been bought up for a relatively small figure, and Mr. Perry states in his affidavit that:

"The intention of Mr. Thorne and myself in purchasing the Portchester Company had been to overcome the most serious obstacle in the way of the construction of the Westchester road. At that time it seemed exceedingly improbable that either road could be constructed in the face of the opposition of the other."

This opposition being dissipated, what was the motive for turning over the Westchester Company to its aforetime rival? Messrs. Perry and Thorne say that they became possessed of grave doubts as to the validity of the Westchester Company's charter, and this notwithstanding that they had long been directors and officers of the Westchester Company, Mr. Perry serving as chairman of its executive committee. The validity of its charter had been questioned by the underwriting syndicate, but on reference to a committee of distinguished counsel

the syndicate on January 23, 1904, received a reply specifically declaring an opinion that the Westchester Company has "the status of a valid corporation with full authority to construct its road." This opinion was signed by Messrs. William B. Hornblower, John G. Johnson, the distinguished Pennsylvania solicitor, George S. Graham, and Charles E. Hughes, present Governor of this state. Subsequently to the rendition of that opinion Messrs. Perry and Thorne, as presidents of their respective trust companies, invested the sum of $300,000 trust funds in the securities of the Westchester Company; the defendant Perry stating his reliance upon this opinion. It is urged, however, that thereafter the Hon. Alton B. Parker, former chief judge of the Court of Appeals, "after an extensive study of the subject, rendered a written opinion to the effect that the charter of the Westchester Company was invalid and could not be sustained by the courts." As to this, it appears that an application was made to the attorney general by Mr. Stumpf for leave to institute quo warranto proceedings against the directors of the Westchester Company. After extended argument before the Attorney General, Mr. Samuel Untermyer and Mr. Charles A. Collin being heard for the applicant and a brief submitted on his behalf by Judge Alton B. Parker, Messrs. William B. Hornblower, Edward Lauterbach, George S. Graham, and J. Tredwell Richards being heard for the defendants, the Attorney General, in an elaborate opinion rendered May 24, 1905, going fully into all the questions raised before him, denied the application, leaving the validity of that charter undisturbed. Plaintiff insists that the opinion of Judge Parker is the same as his brief on that application to the Attorney General. This the defendants do not admit. However that may be, I have read with much care and instruction the opinion of that eminent jurist now submitted, though unable to discern that he therein states it to be "his opinion that the charter of the Westchester Company is invalid and could not be sustained in the courts." Counsel for the Portchester Company, in an exhaustive brief, contends that "the Westchester Company is not now and never was a duly incorporated company." Counsel for Messrs. Perry and Thorne and Millbrook Company contend "that the proposed contract is authorized by law, is fair, and is in just recognition of the interests of the Westchester Company." Counsel for the Westchester Company and the contract company join in the brief of counsel for Messrs. Perry and Thorne. A pertinent inquiry is: Why is the Portchester Company willing to enter into an agreement with a company whose charter it claims is invalid? Whether the court will on the trial of this equitable action adjudicate the life or death of the Westchester Company remains to be seen. My impression is that whatever assets the Westchester Company had or has must in a proper proceeding be accounted for under statutory regulations, and that its life or death should be determined under like regulations. People v. U. & D. R. R., 128 N. Y. 240, 28 N. E. 635. The Attorney General has denied one application to end its corporate life. The general corporation law prescribes certain procedure on this subject. Mr. Perry states in his affidavit that there is a condemnation proceeding pending in which the validity of the Westchester Company's charter

will be finallly determined. But, granting for argument the power on this motion to adjudge that the Westchester Company is in or out of existence, its assumption should not be exerc·sed owing to the conflicting positions taken by the Portchester Company and Messrs. Perry and Thorne. The former insists that the Westchester Company never was nor is, while the latter, in control of both companies, as well as the contract company and the Millbrook Company, pray that the Westchester Company be allowed to execute the proposed contract. To hold now that that there is no Westchester Company might deprive Messrs. Perry and Thorne of the opportunity to convince the trial court that the contract, which recites "whereas the Westchester Company is a railroad corporation of the State of New York organized for the purpose," etc., should be executed. Besides, if the Westchester Company's charter is invalid, it follows that the proposed contract under section 15, c. 565, p. 1089, of the Railroad Law could not be made, for that requires the existence of "two railroad corporations," and, if the Westchester Company's charter is invalid, there is but one corporation, and therefore the proposed contract would be a nullity. If the Westchester Company's charter is valid (and its presumptive validity is here assumed), then the sole question before me is the apparent fairness or unfairness of the proposed contract. It is practically conceded that only one road is necessary or will be built. If this proposed contract is entered into the road of the Westchester Company will in effect be the road of the Portchester Company, and the minority stockholders of the Westchester Company, because of the attitude of the defendants Perry and Thorne, will, in effect, lose the benefit of the work done and property acquired outside of the city of New York which has been shown to be of considerable value. Its franchise in the city of New York will be absorbed and it will be deprived of its construction work and material in the city of New York, the lien of its mortgage controlled by Messrs. Perry and Thorne will not apply to any of the property or rights of the Portchester road outside of the city, the benefits to be derived from the construction, equipment, and operation of a valuable through line will be practically lost to its minority stockholders, and for this, in exchange, is offered to the Westchester Company the naked, abstract, not to say chimerical, claim to operate trains and share the expenses of maintaining the right of way, roadbed, bridges, tunnels, etc., and of salaries of employés upon the portion of its entire route which it has now nearly finished in the city of New York without any actual participation in its management and without any hope of dividends upon its stock. Concededly, should this proposed contract be executed, the construction of the Westchester road beyond the city limits would never be completed.

How, then, can any consideration or benefit be said to flow to the Westchester Company from such a contract? The defendants in their brief tender a stipulation as a condition of denying this motion, whereby the proposed contract be amended so as to provide, in substance, that as an alternative to the right of equal use therein reserved to the Westchester Company that company shall have the right to receive one equal half part of the net profits of the use of the common line affected by such contract, after first allowing and deducting from

the gross receipts in respect thereof an annual sum equal to the 5 per cent. annual interest payable upon and in respect of $6,700,000 of mortgage bonds issued or issuable for the aggregate cost of such common line; or, at its option, in consideration of a surrender and transfer of all its rights, to receive in cash a sum equal to one-half of the net value of the equity of the Westchester Company in such common line, after deducting the amount of such mortgage bonds; such valuation in each instance to be determined upon a concession of the legality of the charter and the franchise of the Westchester Company, and such election in its behalf to be made and its said rights to be enforceable at any time within five years from the completion of such coincident line, and at the instance of the holders of a majority of its stock, exclusive of stock held or owned by Perry or Thorne or the Millbrook Company, or the assigns of them or either of them, or such enforcement may be had either in this or any other appropriate action, by the plaintiff or any other minority stockholder or by the assignees of either of them. This proposition is resisted in plaintiff's reply brief. I do not see that it materially aids the fairness and justice of the proposed contract or improves the conditon of the minority stockholders. It might, if consented to, relieve Messrs. Perry and Thorne from their underwriting obligation, but this the minority stockholders oppose.

There are other points presented by learned counsel for the several defendants and for the plaintiff in their elaborate briefs which I do not deem necessary to discuss. It appears to me, in view of the facts recited, that the plaintiff has good ground to fear that the value of his stock will be greatly depreciated or rendered utterly valueless if the proposed application to the board of estimate is granted and the proposed contract executed, and it would also seem that the plaintiff may reasonably apprehend that the interests of the minority stockholders of the Westchester Company will not be allowed to stand in the way of the furtherance of the plans which the defendants Perry and Thorne have inaugurated, for it is now shown that they have since the commencement of this action resigned as officers and directors of the Westchester Company and that it is their intention to contest in this suit, if possible, the validity of the Westchester Company's charter. "To dissolve an injunction with the inevitable result of defeating plaintiff's remedy without a trial, we must be entirely satisfied that the case is one in which by settled adjudication the plaintiff upon the facts stated is not entitled to final relief. We cannot say that of this plaintiff's complaint in advance of a trial." Young v. Rondout & Kingston Gas Light Co., 129 N. Y. 57, 29 N. E. 83. The board of estimate will not meet until September 20, 1907. This cause should be reached for trial early in the fall. The delay until then can slightly, if at all, harm the defendants, but, should the board grant the application and the proposed contract be executed, in my opinion irreparable loss to the plaintiff would follow, even should he succeed at the trial.

Motion to continue the injunction granted. Settle order upon notice.